IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

GEORGE W. MARTHERS, III, et al.     :          CIVIL ACTION
                                    :
        v.                          :
                                    :
ALBERTO GONZALES                    :          NO.  05-3778

## MEMORANDUM OF DECISION

THOMAS J. RUETER                                        May 30, 2008
Chief United States Magistrate Judge


Presently before the court is defendant's Motion for Judgment as a Matter of Law or, Alternatively, For a New Trial, with a memorandum of law in support of its motion (Doc. No. 57) (the "Motion").[1]  Plaintiffs filed a Memorandum of Law in Opposition to defendant's Motion (Doc. No. 62) ("Pls.' Mem. of Law") and defendant filed a Reply Brief in Support of Government's Motion for Judgment as a Matter of Law or, in the Alternative, for a New Trial (Doc. No. 69) ("Reply Br.").  The matter is now before the court for decision.  For the reasons stated herein, defendant's Motion is denied.

## I.     BACKGROUND

### A.     Procedural Background

Plaintiffs George W. Marthers, III and Jude T. McKenna, agents at the Drug Enforcement Administration ("D.E.A.") filed the instant action, alleging that they were victims of a racially hostile environment and of retaliation.  The case was tried before a jury for seven days, from December 6, 2007 through December 14, 2007.  The jury returned a verdict in

---

[1]     The court denied defendant's motion for judgment as a matter of law as to the discrimination and retaliation claims at the close of evidence.  See Fed. R. Civ. P. 50(a) and N.T. 12/12/07 at 228-29; N.T. 12/13/07 at 32.

plaintiffs' favor on each claim, awarding plaintiff Marthers $3,000,000 and plaintiff McKenna $4,000,000 in compensatory damages.  See Jury Interrogatory Form (Doc. No. 54).  Defendant filed a Motion to Amend Judgment pursuant to Fed. R. Civ. P. 59(e) and 42 U.S.C. § 1981a(b)(3)(D) to reduce the compensatory damage award to each plaintiff to $300,000 (Doc. No. 58).  On January 3, 2008, the court entered an order so amending the judgment (Doc. No. 65).

Defendant posits the following arguments as the bases for its present Motion: (1) plaintiffs offered insufficient evidence to support their contention that they were victims of a racially hostile environment; (2) plaintiffs offered insufficient evidence to support their claim of retaliation; and (3) the court's ruling on plaintiffs' motion in limine which precluded defendant from raising the issue that plaintiffs were Giglio impaired and cross-examining plaintiffs with respect to the incidents that led to such impairment, was unfairly prejudicial to the government's defense.  In the Motion, defendant asks the court for judgment as a matter of law, pursuant to Rule 50(b) of the Federal Rules of Civil Procedure, or, alternatively, for a new trial pursuant to Fed. R. Civ. P. 59(a).

### B.   Factual Background

The following are the facts adduced at trial as the jury may have found them. Both plaintiffs are Caucasian.  The alleged discriminating officials, Johnny Fisher and Dempsey Jones, plaintiffs' former first- and second-line supervisors, respectively, are African-American. Each plaintiff testified at trial in support of his claims.  (N.T. 12/6/07 at 85-104; N.T. 12/7/07 at 8-194; N.T. 12/10/07 at 28-198.)  Neither Mr. Fisher nor Mr. Jones testified on behalf of defendant, although selected portions of their prior deposition testimony were read into the

2

record.  (N.T. 12/11/07 at 124-99; N.T. 12/12/07 at 16-29, 61-97.)  Both Mr. Fisher and Mr.

Jones have retired from employment with the DEA.  (N.T. 12/10/07 at 195.)

        During the time period relevant to this case, plaintiffs McKenna and Marthers

were stationed in the DEA's Philadelphia Field Division and were members of the Special

Support Unit ("SSU").  (N.T. 12/6/07 at 88, 96.)  At that time, the SSU was comprised of the

following individuals: plaintiff McKenna was the Demand Reduction Coordinator, plaintiff

Marthers was the Confidential Source Coordinator, Rick Woodcock was the Division Training

Officer, Sharon Firewicz was the Firearms Instructor, and Denise Grant was the Recruiter.  (N.T.

12/6/07 at 96.)  Ms. Grant is African-American and Messrs. Marthers, McKenna and Woodcock

and Ms. Firewicz are Caucasian.  (N.T. 12/6/07 at 96.)

        Plaintiff McKenna has been employed by the DEA since July 1989 and has been

stationed in the Philadelphia Field Division since October 1998.[2]  (N.T. 12/6/07 at 86, 88.)  From

January 2000 until April 2002, Mr. McKenna acted as the Demand Reduction Coordinator and

was responsible for drug education activities in the Philadelphia Field Division.  (N.T. 12/6/07 at

87, 89.)  The Philadelphia Field Division encompasses the Commonwealth of Pennsylvania and

the State of Delaware.[3]  (N.T. 12/6/07 at 89.)  Mr. McKenna's responsibilities included, <u>inter</u>

---

[2]    At the time of the trial, Mr. McKenna was assigned to the Asset Forfeiture Unit,
conducting financial investigations on narcotics traffickers.  (N.T. 12/7/07 at 8.)

[3]    Because the Philadelphia Field Division is geographically broad, Mr. McKenna
sought the assistance of other agents, analysts and investigators with the Demand Reduction
efforts in areas outside the Philadelphia region.  (N.T. 12/6/07 at 89.)

alia, speaking engagements at schools and other community organizations, and running the

Explorers program[4] for the Philadelphia Field Division.  (N.T. 12/6/07 at 87-89.)

At the time of the trial, Mr. Marthers had been employed by the DEA for twenty-

five years and had been stationed in the Philadelphia Field Division for approximately eight and

one-half years.  (N.T. 12/10/07 at 28.)  Mr. Marthers acted as Confidential Source Coordinator

from the late Fall of 2000 until March 2002.[5]  (N.T. 12/10/07 at 29-31.)  As the Confidential

Source Coordinator, Mr. Marthers was responsible for processing the paperwork for the DEA's

use of confidential sources, or informants.  (N.T. 12/10/07 at 34.)

In December 2001, Mr. Fisher was appointed as group supervisor of the SSU unit

and became plaintiffs' first-line supervisor.  (N.T. 12/6/07 at 95; N.T. 12/7/07 at 136; N.T.

12/10/07 at 34-35.)  At or about the same time, Mr. Jones was appointed the Special Agent in

Charge ("SAC") of the Philadelphia Field Division.  (N.T. 12/6/07 at 95; N.T. 12/10/07 at 34.)

In his position as SAC, Mr. Jones had little direct contact with plaintiffs.  (N.T. 12/12/07 at 63.)

Each plaintiff testified that during the time that Mr. Fisher acted as his supervisor,

from December 2001 to April 2002, Mr. Fisher treated Mr. McKenna and Mr. Marthers in an

abusive, hostile, demeaning and confrontational manner.  (N.T. 12/7/07 at 12, 22; N.T. 12/10/07

at 36-37.)  Mr. McKenna testified that he believed that Messrs. Fisher and Jones had a racial

agenda and that they would use false accusations of integrity violations as a basis for terminating

his employment.  (N.T. 12/7/07 at 122.)  Mr. Marthers testified that he believed that Mr. Fisher's

_____

[4]        The Explorers program educates high school students about careers in law
enforcement.  (N.T. 12/6/07 at 88-89.)

[5]        At the time of trial, Mr. Marthers was assigned to the Asset Forfeiture section of
the DEA.  (N.T. 12/10/07 at 29-31.)

treatment of him was racially motivated because plaintiffs were treated in a degrading, hostile

manner while the African-American agents, in particular Denise Grant, were treated differently.

(N.T. 12/10/07 at 124-26.)

## II.     LEGAL STANDARDS

### A.     Motion for Judgment as a Matter of Law

Defendant moves pursuant to Fed. R. Civ. P. 50(b) for judgment as a matter of

law.  Rule 50(b) provides, in relevant part, as follows:

> If, for any reason, the court does not grant a motion for judgment as a matter of
> law made at the close of all the evidence, the court is considered to have
> submitted the action to the jury subject to the court's later deciding the legal
> questions raised by the motion.  The movant may renew its request for judgment
> as a matter of law . . . and may alternatively file a motion for a new trial under
> Rule 59.  In ruling on a renewed motion, the court may:
>
> > (1)  if a verdict was returned:
> >
> > > (A)  allow the judgment to stand,
> > > (B)  order a new trial, or
> > > (C)  direct entry of judgment as a matter of law.

Fed. R. Civ. P. 50(b).

Judgment as a matter of law should be granted only sparingly.  Lightning Lube,

Inc. v. Witco Corp., 4 F.3d 1153, 1166 (3d Cir. 1993).  A motion for judgment as a matter of law

should be granted only if, viewing the evidence in the light most favorable to the nonmovant and

giving the nonmovant the advantage of every fair and reasonable inference, there is insufficient

evidence from which a jury reasonably could find liability.  Id. at 1167 (citing Wittekamp v. Gulf

& Western, Inc., 991 F.2d 1137, 1141 (3d Cir. 1993)); Marra v. Philadelphia Housing Auth., 497

F.3d 286, 300 (3d Cir. 2007) (same).  In deciding a motion for judgment as a matter of law, the

court may not weigh the evidence presented at trial, determine credibility of witnesses, or substitute its version of facts for that of the jury.  Lightning Lube, 4 F.3d at 1166.  See also Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150 (2000) (same).  In addition, the court must disregard all evidence favorable to the moving party that the jury is not required to believe.  Reeves, 530 U.S. at 151.  The Supreme Court explained that the trial court "should give credence to the evidence favoring the nonmovant as well as that evidence supporting the moving party that is uncontradicted and unimpeached, at least to the extent that the evidence comes from disinterested witnesses."  Id. (quotation omitted).  In making its determination, the court should review all of the evidence in the record.  Id. at 150.  Although judgment as a matter of law should be granted only sparingly, "a scintilla of evidence is not enough to sustain a verdict of liability."  Lightning Lube, 4 F.3d at 1166 (citing Walter v. Holiday Inns, Inc., 985 F.2d 1232, 1238 (3d Cir. 1993)).  See also Goodman v. Pa. Turnpike Comm'n, 293 F.3d 655, 665 (3d Cir. 2002) (same).  "'The question is not whether there is literally no evidence supporting the party against whom the motion is directed but whether there is evidence upon which the jury could properly find a verdict for that party.'"  Lightning Lube, 4 F.3d at 1166 (quoting Patzig v. O'Neil, 577 F.2d 841, 846 (3d Cir. 1978)).

**B.**   **Motion for New Trial**

Defendant also has moved for a new trial as an alternative to its motion for judgment as a matter of law.  Fed. R. Civ. P. 59(a) sets forth the grounds on which the court may grant a motion for a new trial:

A new trial may be granted to all or any of the parties and on all or part of the issues (1) in an action in which there has been a trial by jury, for any of the

reasons for which new trials have heretofore been granted in actions at law in courts of the United States. . . .

Fed. R. Civ. P. 59(a)(1).  These reasons include verdicts which are against the weight of evidence or prejudicial errors of law.  Klein v. Hollings, 992 F.2d 1285, 1289-90 (3d Cir. 1993); Roebuck v. Drexel Univ., 852 F.2d 715, 736 (3d Cir. 1988).  When the basis of the motion for a new trial is an alleged error involving a matter within the discretion of the trial court, such as the court's evidentiary rulings or jury instructions, the trial court has wide discretion in ruling on the motion. Wagner v. Fair Acres Geriatric Ctr., 49 F.3d 1002, 1017 (3d Cir. 1995).  In evaluating a motion for a new trial on the basis of trial error, a district court must first determine whether an error was made in the course of the trial and then decide "whether that error was so prejudicial that refusal to grant a new trial would be 'inconsistent with substantial justice.'"  Bhaya v. Westinghouse Elec. Corp., 709 F. Supp. 600, 601 (E.D. Pa. 1989) (quoting Fed. R. Civ. P. 61), aff'd, 922 F.2d 184 (3d Cir. 1990).

        The court's discretion to grant a new trial is more limited when the asserted ground is that the verdict is against the weight of the evidence.  In that instance, the Third Circuit Court of Appeals has stated that "'new trials because the verdict is against the weight of the evidence are proper only when the record shows that the jury's verdict resulted in a miscarriage of justice or where the verdict, on the record, cries out to be overturned or shocks our conscience.'"  Greenleaf v. Garlock, Inc., 174 F.3d 352, 366 (3d Cir. 1999) (quoting Williamson v. Consol. Rail Corp., 926 F.2d 1344, 1353 (3d Cir. 1991)).  It is not a proper basis to grant a new trial merely because the court would have reached a different verdict.  Kotas v. Eastman

7

Kodak Co., 1997 WL 570907, at *7 (E.D. Pa. Sept. 4, 1997), aff'd, 166 F.3d 1205 (3d Cir. 1998) (Table).

## III.   DISCUSSION

### A.   Race Discrimination Claim

The court instructed the jury that to find the defendant liable for race discrimination, plaintiffs had to prove: (1) that they were subjected to intentional discrimination; (2) the conduct of Messrs. Fisher and Jones was not welcome by plaintiffs; (3) Mr. Fisher and Mr. Jones' conduct was motivated by the fact that plaintiffs are Caucasian; (4) the conduct was so severe or pervasive that a reasonable person of the same protected class in plaintiffs' positions would find the environment to be hostile or abusive; and (5) plaintiffs believed their work environment to be hostile and abusive as a result of the conduct of Messrs. Fisher and Jones. (N.T. 12/13/07 at 94.) See also Andreoli v. Gates, 482 F.3d 641, 643 (3d Cir. 2007) (setting forth standard for stating a claim under Title VII for discrimination resulting from a hostile work environment). The jury was instructed that in determining whether a work environment is hostile, they must find, inter alia, that plaintiffs were harassed because they are Caucasian and also, that the evidence must be considered from the perspective of a reasonable Caucasian person in the same position. (N.T. 12/13/07 at 95.) The court also charged the jury to consider the non-discriminatory business reasons for defendant's treatment of plaintiffs, whether defendant's explanation for its conduct should be believed, and whether plaintiffs proved that race was a determinative factor in defendant's actions. (N.T. 12/13/07 at 98.) See Sarullo v. U.S. Postal Serv., 352 F.3d 789, 797 (3d Cir. 2003) (citing McDonnell Douglas Corp. v. Green, 411 U.S. 792, 804 (1973)).

8

In its Motion, defendant contends that plaintiffs failed to prove that there was a racially hostile workplace environment.  (Mot. at 2-7.)  Specifically, defendant contends that the racial agenda alleged by plaintiffs was not a racial agenda, but rather, Mr. Fisher and Mr. Jones simply sought to institute policies and direct the actions of their subordinates.  See N.T. 12/7/07 at 132.  Moreover, defendant posits that the evidence presented by plaintiffs at trial merely shows that their workplace was unpleasant and, at times, harsh for both Caucasian and African-American employees.  (Mot. at 7.)  As a result, defendant seeks judgment as a matter of law pursuant to Fed. R. Civ. P. 50(b).

In the present case, the court finds that the evidence presented at trial was sufficient to support the jury's findings in favor of plaintiffs on the race discrimination claim. The jury heard lengthy testimony from plaintiffs and their witnesses regarding plaintiffs' claims that they were subjected to a racially hostile environment.  A summary of the relevant evidence pertaining to plaintiffs' race discrimination claim follows:

### 1.    January 17, 2002 Phone Call

On January 17, 2002, a conversation between Mr. Jones and Mr. Fisher was recorded on Mr. McKenna's voicemail system.[6]  (N.T. 12/7/07 at 42.)  Mr. McKenna recorded an audio copy of the voicemail message and also prepared a written transcript of the message.  (N.T. 12/7/07 at 43-45.)  See Ex. 47.  The DEA also prepared a transcript of the message.  (N.T. 12/7/07 at 45-46.)  See Ex. 48.  According to plaintiffs, they were concerned after hearing the recorded voicemail message because it involved two DEA supervisors discussing race issues and

---

[6]      It appears that Mr. Fisher called Mr. McKenna's office phone number and did not terminate the call after the voicemail system activated; a conversation between Mr. Fisher and Mr. Jones was then recorded.  (N.T. 12/7/07 at 43-44.)

the termination of the employment of certain individuals.  (N.T. 12/7/07 at 46; N.T. 12/10/07 at

45.)  In the voicemail message, Mr. Fisher and Mr. Jones referred to four African-American DEA

agents who were assigned to the Philadelphia Field Division in January 2002.  (N.T. 12/7/07 at

48, 128-30; N.T. 12/10/07 at 48.)  Mr. McKenna interpreted the comments to mean that Mr.

Jones and Mr. Fisher were going to "clean house based on a racial agenda" and Mr. Marthers

feared that he was one of the individuals who was targeted for termination.  (N.T. 12/7/07 at 50;

N.T. 12/10/07 at 48.)  Neither Mr. McKenna nor Mr. Marthers were explicitly referenced in the

voicemail.  (N.T. 12/7/07 at 48, 127; N.T. 12/10/07 at 48.)  In deposition testimony read into the

record at trial, both Mr. Fisher and Mr. Jones denied that they were speaking of any racial agenda

in the voicemail message.  (N.T. 12/11/07 at 177-79; N.T. 12/12/07 at 89-90.)

After reviewing the transcript of the voicemail message, Mr. McKenna and Mr.

Marthers felt that the hostile treatment they were experiencing was the result of the purported

racial agenda of Messrs. Fisher and Jones.  (N.T. 12/7/07 at 50.)  In addition, plaintiffs were

fearful that their employment would be terminated as a result of various integrity issues that Mr.

Fisher and Mr. Jones alleged against plaintiffs.  (N.T. 12/7/07 at 50.)

## 2.   **Promotion Policy**

Plaintiffs contend that Mr. Jones had a racially biased promotion policy in the

Philadelphia Field Division.  In support of this claim, plaintiffs presented the deposition

testimony of Emmet Hyland who held the position of group supervisor of the SSU unit prior to

Mr. Fisher.  Mr. Hyland testified that he attended a meeting after Mr. Jones became the SAC of

the Philadelphia Field Division during which Mr. Jones discussed his promotion policy.  (N.T.

12/12/07 at 179.)  Mr. Hyland testified that during the meeting, Mr. Jones explained that he

10

wanted the best qualified ("BQ") list, which is a list submitted to the career board with the SAC's top three recommendations for group supervisor promotions, to include "an African-American person, a white and a minority."  (N.T. 12/12/07 at 180, 184-85.)  Mr. Hyland found Mr. Jones' policy to be "striking" because he had never before been given such instructions and because the policy could potentially eliminate qualified candidates for consideration.  (N.T. 12/12/07 at 181.)

### 3.    Impact of "Racial Agenda" on Demand Reduction Activities

Plaintiffs contend that Messrs. Fisher and Jones had a "racial agenda" as demonstrated by their mandate that Demand Reduction activities be focused in the inner city to the exclusion of the suburbs.  Specifically, Mr. McKenna testified that at the first meeting of the SSU unit after Mr. Fisher became the supervisor, on January 7, 2002, Mr. Fisher instructed Mr. McKenna to cancel all future Demand Reduction programs that Mr. McKenna had scheduled, to work exclusively in the city of Philadelphia, and to cancel all plans for Black History Month. (N.T. 12/6/07 at 98-99.)

Mr. McKenna testified that on several occasions, Mr. Fisher instructed him to cease Demand Reduction activities in the suburbs and to concentrate his efforts in the city.  (N.T. 12/6/07 at 96-97; N.T. 12/7/07 at 9.)  In response, Mr. McKenna sought clarification from DEA headquarters to ascertain whether there had been a change in DEA policy directing Demand Reduction agents to work exclusively in urban areas, but was informed there had been no such policy change.  (N.T. 12/6/07 at 98.)  Mr. McKenna believed that Mr. Fisher's instructions were racially motivated in that Mr. Fisher wanted Mr. McKenna to focus his efforts on the African-American community in the city, to the exclusion of the Caucasian population in suburban areas. (N.T. 12/7/07 at 10-11.)

11

Mr. McKenna also testified that Mr. Fisher refused to approve the use of DEA funds to sponsor a suburban baseball team.  (N.T. 12/7/07 at 10-11.)  The prior year as part of his Demand Reduction efforts, Mr. McKenna provided the Upper Southampton baseball team with $100 to purchase team shirts that displayed the DEA logo and spoke at a league-wide meeting to promote the DEA's anti-drug message.  (N.T. 12/7/07 at 10.)  However, Mr. Fisher refused to approve the funding for the second year when he realized that the team was located in the suburbs, stating "[w]e're not paying those people."  (N.T. 12/7/07 at 11; N.T. 12/11/07 at 189-92.)

Mr. McKenna also testified that Messrs. Fisher and Jones promoted their "racial agenda" in connection with the Explorers program.  Mr. McKenna ran the Explorers program in the Philadelphia Field Division for two years prior to Mr. Fisher's arrival at the Philadelphia Field Division.  (N.T. 12/7/07 at 16.)  However, when Mr. Fisher became Mr. McKenna's supervisor, Mr. Fisher directed Mr. McKenna that he wanted only city residents to participate in the Explorers program.  (N.T. 12/7/07 at 17.)  Mr. Fisher also dictated that he would assign the DEA agents who would act as advisors to the Explorers program and that the individuals who had already volunteered to act as advisors would not be permitted to do so.  (N.T. 12/7/07 at 18-20.)  The individuals who had volunteered to be advisors were Caucasian and the individuals who Mr. Fisher assigned to be advisors were African-American and Hispanic.  (N.T. 12/7/07 at 18-20.)  Mr. Fisher explained to Mr. McKenna that he made that change because the Explorers needed to be taught by people who looked like them and spoke like them.  (N.T. 12/7/07 at 20.)

12

Mr. McKenna was offended by Mr. Fisher's suggestion that Mr. McKenna was unable to relate to African-American or Hispanic students.[7]  (N.T. 12/7/07 at 20.)

Mr. McKenna also testified that Mr. Fisher's "racial agenda" hindered his ability to successfully perform his Demand Reduction activities.  For example, Mr. McKenna ran a program at the John Hancock School pursuant to which the DEA adopted the school and Mr. McKenna acted as mentor to a group of students who were considered to be at risk.  (N.T. 12/6/07 at 94; N.T. 12/10/07 at 8-10.)  The John Hancock School is located in Philadelphia; fifty percent of its students are Caucasian, forty percent are African-American, and approximately ten percent are Hispanic and Asian.  (N.T. 12/7/07 at 12; N.T. 12/10/07 at 11-12.)  As part of the mentor program, Mr. McKenna met with students during their lunchtime, reviewed their homework, and spent time talking with them.  (N.T. 12/7/07 at 13-14; N.T. 12/10/07 at 10-11.)  Mr. McKenna also ran poster and essay contests at the school to promote the DEA's anti-drug message.  (N.T. 12/7/07 at 14.)  Mr. McKenna felt that he had a strong presence in the school.  (N.T. 12/7/07 at 14.)  The school nurse testified that the mentor program was well-regarded and a positive influence for the students who participated.  (N.T. 12/10/07 at 12-18.)  Ultimately, Mr. Fisher instructed Mr. McKenna to cancel the mentor program at the John Hancock School to the dismay of the school administration and chose, instead, to adopt two other schools located in

---

[7]  On one occasion, Mr. Jones was critical of the way Mr. McKenna demonstrated a handcuffing technique at an Explorers meeting.  (N.T. 12/7/07 at 21.)  Mr. McKenna instructed the students how to handcuff a suspect and allowed the students to handcuff the advisors and to be handcuffed themselves.  (N.T. 12/7/07 at 21.)  Mr. Jones claimed that Mr. McKenna was promoting a racial stereotype by having Caucasian agents handcuff minority students, despite the fact that Mr. McKenna also allowed the students to handcuff the advisors.  (N.T. 12/7/07 at 21.)

Philadelphia which had predominately minority student bodies.[8]   (N.T. 12/7/07 at 24-25, 55-56, 62; N.T. 12/10/07 at 18-19.)  School administrators at the John Hancock School were distraught when they learned that the mentor program had been cancelled because they viewed the program to be a success.  (N.T. 12/10/07 at 19-23.)  Both the nurse and the principal of the John Hancock School sent letters to the Administrator of the DEA expressing their displeasure with Mr. McKenna's transfer out of the Demand Reduction Coordinator position and the subsequent cancellation of the drug prevention efforts at the school, particularly the mentor program.  (N.T. 12/7/07 at 56-57; N.T. 12/10/07 at 6, 19-24; Ex. 33.)

   Mr. McKenna also testified that Mr. Fisher usurped his job responsibilities by requiring Mr. McKenna to first consult with Mr. Fisher and/or Mr. Jones prior to scheduling any event.  (N.T. 12/7/07 at 22-23, 54-55.)  Mr. McKenna documented his concern that his job duties were being taken away from him in a memorandum to Mr. Fisher.  (N.T. 12/7/07 at 32-33; Ex. 185.)  In the memorandum, Mr. McKenna asked Mr. Fisher to reconsider his directive that Mr. McKenna refrain from contacting members of the community to schedule Demand Reduction activities.  Id.  Mr. McKenna was concerned that he would receive an unsatisfactory evaluation as a result of Mr. Fisher's interference, because he was unable to perform his work duties.  (N.T. 12/7/07 at 33, 143.)  Mr. McKenna did not receive a response from Mr. Fisher regarding the memorandum.  (N.T. 12/7/07 at 33.)

---

[8]  After Mr. McKenna was detailed out of the Demand Reduction Coordinator position, Mr. Fisher and Mr. Jones adopted two other schools located in Philadelphia, the student body of one school was predominately African-American and the other was comprised of predominately Hispanic and African-American students.  (N.T. 12/7/07 at 62.)

In contrast to the interference that he experienced under Mr. Fisher's supervision, Mr. McKenna testified that under his prior supervisor, Mr. McKenna had free reign to assess the needs of the community and direct the Demand Reduction efforts accordingly.  (N.T. 12/6/07 at 89-90.)  Mr. McKenna received two year-end evaluations from his prior supervisor, Emmet Highland, for the years 2000 and 2001, and received a score of "outstanding," the highest in the DEA ranking system.[9]  (N.T. 12/6/07 at 91; Ex. 191.)  While Mr. Highland was Mr. McKenna's supervisor, Mr. McKenna felt there was a good balance between Demand Reduction activities in Philadelphia and in the suburbs of Philadelphia.  (N.T. 12/6/07 at 93.)

### 4.    False Accusations against Plaintiffs

Mr. McKenna testified that Mr. Fisher on several occasions accused Mr. McKenna of failing to perform his duties.  During the January 7, 2002 meeting of the SSU unit, Mr. McKenna provided Mr. Fisher with a synopsis of his Demand Reduction activities over the prior two years, but Mr. Fisher subsequently accused Mr. McKenna of failing to provide the synopsis.  (N.T. 12/6/07 at 100-04; Ex. 190.)  Mr. Fisher also accused Mr. McKenna of failing to keep Mr. Fisher apprised of Mr. McKenna's schedule.  Id.  Under a system established by his prior supervisor, however, Mr. McKenna provided Mr. Fisher with a calendar that showed the schedule of his Demand Reduction activities.  (N.T. 12/6/07 at 90, 102.)

In February 2002, Mr. Fisher accused Mr. McKenna of being absent without leave ("AWOL") for a week, threatened to report Mr. McKenna as AWOL, and demanded that Mr. McKenna submit a leave slip reflecting that he was out of the office the entire week.  (N.T.

---

[9]    In the two years prior to Mr. Fisher's arrival as supervisor of the SSU unit in December 2001, Mr. Marthers received an "outstanding" evaluation and also was rated as "significantly exceeds expectations."  (N.T. 12/10/07 at 31-33; Ex. 200.)

12/7/07 at 27-32, 141-43.)  Mr. Fisher had actually pre-approved one day's absence during that

week and Mr. McKenna reported that he was ill on another day.  Id.  On the other three days, Mr.

McKenna was in the office.  Id.  As a result, Mr. McKenna refused to submit a leave slip

indicating that he was out of the office the entire week.  Id.  After failing to come to terms with

Mr. Fisher, Mr. McKenna attempted to meet with Mr. Jones to resolve the issue, but was told

that Mr. Jones would not meet with him.  Id.  After a number of contentious conversations

between Mr. McKenna and Mr. Fisher over the course of several days, Mr. Fisher ultimately

signed Mr. McKenna's time and attendance report which showed that Mr. McKenna was, in fact,

absent only two of the five work days.  Id.  William Nelson, an Assistant Special Agent in

Charge ("ASAC") in the Philadelphia Field Division, testified that Mr. Fisher discussed the

potential AWOL issue with him and that he was astonished that Mr. Fisher would make such an

allegation against Mr. McKenna.  (N.T. 12/11/07 at 10-11.)

   Mr. Fisher also accused Mr. McKenna of misappropriating DEA funds for

personal use.  (N.T. 12/7/07 at 33-34.)  As part of his Demand Reduction efforts, Mr. McKenna

organized a CPR training class for the members of the Explorers program.  (N.T. 12/7/07 at 34.)

On the day of the training class, Mr. McKenna and another Explorers advisor, who was a

Hispanic female, brought their minor children to the class.  (N.T. 12/7/07 at 35-36.)  The charge

for the class was a flat fee for all attendees and there was no additional charge for having the

children present while the class was conducted.  (N.T. 12/7/07 at 35-37.)  Six months after the

class was conducted, Mr. Fisher accused Mr. McKenna of misappropriating funds and an

investigation by the DEA's Office of Professional Responsibility ("OPR") was conducted to

determine if Mr. McKenna, but not the other DEA agent who had brought her child to the class, had inappropriately used DEA funds to his benefit.  (N.T. 12/7/07 at 36-37.)

In addition, Mr. Marthers testified that Mr. Fisher accused Mr. Marthers of failing to comply with the DEA's policies with respect to the way Mr. Marthers ran the Confidential Source Coordination program.  (N.T. 12/10/07 at 56.)  For example, Mr. Fisher instructed Mr. Marthers to reorganize the confidential source files, alleging that the files were not maintained in compliance with DEA policy and insisting that CS Inspection Checklist be filled out and inserted into each file for each informant.  (N.T. 12/10/07 at 56-57.)  Mr. Marthers explained to Mr. Fisher that he did not have the necessary information to complete the CS Inspection Checklists.  (N.T. 12/10/07 at 57-58.)  Mr. Marthers confirmed with DEA headquarters that Mr. Fisher's instructions were not in accordance with DEA procedure, but Mr. Fisher insisted that Mr. Marthers should complete the CS Inspection Checklists.  (N.T. 12/10/07 at 58-59.)

On another occasion, Mr. Marthers became concerned when Mr. Fisher kept a confidential source file for a week, when typically, the files were not supposed to be kept out overnight.  (N.T. 12/10/07 at 59-62.)  Mr. Marthers wrote a memorandum to Mr. Fisher requesting that he return the file because he was concerned that if he simply asked Mr. Fisher to return the file, Mr. Fisher would deny receiving the file from Mr. Marthers.  (N.T. 12/10/07 at 62.)  Mr. Marthers also testified that Mr. Fisher made false accusations against him on a number of other occasions, including inter alia, with respect to the completion of background investigations, the preparation of the Quarterly Management Review for the Confidential Source Program, and violations of the DEA dress code.  (N.T. 12/10/07 at 55-56, 63-65.)

17

### 5.    Impact of "Racial Agenda" on Recruiting Policy

Plaintiffs contend that Messrs. Fisher and Jones also imposed their "racial agenda" on the Philadelphia Field Division's recruiting policy.  Denise Grant, who was a DEA recruiter from 1999 until February 2003, testified that when Mr. Fisher was her supervisor for approximately eleven months, Mr. Fisher hindered her ability to effectively complete her recruiting duties.[10]  (N.T. 12/12/07 at 30-31, 37-38, 44, 54.)  Mr. Fisher only approved Ms. Grant to attend one job fair and visit three schools, while Ms. Grant's previous supervisor approved her attendance at approximately thirty to thirty-five school recruiting events.  (N.T. 12/12/07 at 38.)  According to Ms. Grant's testimony, Mr. Fisher only permitted her to recruit at schools and job fairs that were attended primarily by minorities.  (N.T. 12/12/07 at 38-41.)  Ms. Grant also testified that Mr. Jones and Mr. Fisher stressed to her the recruitment of minorities in the community.  (N.T. 12/12/07 at 38, 53.)  Ms. Grant, an African-American woman, testified that she believed that Mr. Fisher was harder on her than other DEA employees in order to demonstrate that he was not a racist.  (N.T. 12/12/07 at 57-59.)

### 6.    Other Evidence of Racially Hostile Work Environment

Plaintiffs also testified that Messrs. Fisher and Jones created a hostile work environment by threatening them and using inappropriate and derogatory language.  Mr. McKenna testified that when Mr. Fisher ordered him to exchange his DEA vehicle with that of another agent, Mr. Fisher reacted in a threatening manner when he was told by Mr. McKenna that the exchange would take place the following day instead of that day.  (N.T. 12/7/07 at 40-41.)

---

[10]    Ms. Grant's deposition testimony was read into the record.  (N.T. 12/12/07 at 30-60.)

Mr. McKenna heard Mr. Fisher yell at Mr. Marthers and observed Mr. Fisher treating Mr.

Woodcock in a derogatory and abusive manner.  (N.T. 12/7/07 at 42.)  In addition, Mr. Marthers

testified that Mr. Fisher screamed at him and used inappropriate language.  (N.T. 12/10/07 at 66.)

   Plaintiffs also testified to other incidents that demonstrate the racially hostile work

environment at the Philadelphia Field Division during the tenures of Messrs. Fisher and Jones.

Mr. Marthers testified that Denise Grant, another agent in the SSU unit, told him that Mr. Fisher

had ordered her to check up on Mr. McKenna, Mr. Marthers and Mr. Woodcock and to

determine whether they were at their desks and/or in the office.  (N.T. 12/10/07 at 37-43.)  Mr.

Marthers testified that he felt threatened when Ms. Grant admitted to him that she was checking

up on him pursuant to Mr. Fisher's instructions and when she told Mr. Marthers that "the good

life is over" since Mr. Fisher was then in charge.  Id.  Two days later, Mr. McKenna called Mr.

Marthers to his office and told him about the January 17, 2002 discussion between Mr. Fisher

and Mr. Jones that had been recorded on Mr. McKenna's voicemail.  (N.T. 12/10/07 at 43.)

   Two other DEA agents testified that they were mistreated by Mr. Fisher while

under his supervision.  Donald Bailey testified that Mr. Fisher was his group supervisor from

June 2004 to June 2005 when he was on the financial investigative team.  (N.T. 12/11/07 at 96.)

The team consisted of Mr. Bailey, who is Caucasian, and two other agents, John Douglas, who is

African-American and Louis Schmidt, who is Caucasian.  (N.T. 12/11/07 at 96.)  Mr. Bailey

testified that Mr. Fisher was not friendly toward him and verbally abused him.  (N.T. 12/11/07 at

98.)  On one occasion, Mr. Fisher used profanity toward him in the presence of other DEA agents

and contract workers.  (N.T. 12/11/07 at 99-101.)  Mr. Bailey also observed Mr. Fisher verbally

abusing Mr. Schmidt, but never observed any issues between Mr. Fisher and Mr. Douglas.  (N.T. 12/11/07 at 102-03.)

Mr. Schmidt was supervised by Mr. Fisher for approximately two years, from June 2003 to May 2005.  (N.T. 12/11/07 at 110.)  Mr. Schmidt testified that his time under Mr. Fisher's supervision "was a horrible work environment" for him because Mr. Fisher was demeaning and condescending.  (N.T. 12/11/07 at 113.)  Mr. Schmidt also testified that Mr. Fisher treated Mr. Bailey in the same demeaning manner, but that Mr. Douglas, the African-American agent on the financial investigative team, was treated "a little differently" and was spoken to in a more professional manner.  (N.T. 12/11/07 at 114, 119.)  For instance, Mr. Schmidt testified that Mr. Douglas was permitted to keep different hours than the other agents in the group.  (N.T. 12/11/07 at 118.)  Mr. Schmidt felt that Mr. Fisher "was trying to railroad" his career at the DEA by lying or by accusing Mr. Schmidt of lying.  (N.T. 12/11/07 at 114-17.)  Mr. Schmidt explained that he did not file a complaint with the Equal Employment Opportunity Commission ("EEOC") against Mr. Fisher despite the treatment he received while under his supervision because he was a young agent and witnessed what plaintiffs endured and did not want to be subjected to the same process.  (N.T. 12/11/07 at 121.)

In contrast, defendant presented the jury with the testimony of Sharon Firewicz, who was the Primary Firearms Instructor for the Philadelphia Field Division and a member of the SSU unit in 2002.  (N.T. 12/13/07 at 21.)  Mr. Fisher was Ms. Firewicz's immediate supervisor. (N.T. 12/13/07 at 22.)  Ms. Firewicz described Mr. Fisher's demeanor toward her as "always very professional" and noted that she never had any problems with Mr. Fisher.  (N.T. 12/13/07 at 22.)  Ms. Firewicz also testified that she never heard Mr. Fisher say anything, and never observed

Mr. Fisher do anything, that she would have characterized as racially derogatory.  (N.T. 12/13/07 at 22.)  With respect to Mr. Jones, Ms. Firewicz testified that Mr. Jones was "very professional" and "very supportive" of her program.  (N.T. 12/13/07 at 22.)  Ms. Firewicz never heard Mr. Jones say anything, and never observed Mr. Jones do anything, that she would have characterized as racially derogatory.  (N.T. 12/13/07 at 22-23.)  With respect to her interactions with plaintiffs, Ms. Firewicz found Mr. Marthers to be "disagreeable" and "hard to get along with."  (N.T. 12/13/07 at 23.)

          In response to the evidence presented by plaintiffs, defendant essentially argued to the jury that the evidence presented did not show that plaintiffs were harmed in any way.  Rather, defendant argued that the alleged abusive practices were based upon simple policy decisions, that the DEA does not have infinite resources and resources need to be allocated as determined by DEA supervisors, and that the alleged hostile work environment claims and retaliatory acts could be summarized as "no harm, no foul."  See, e.g., N.T. 12/7/07 at 132-34, 141; N.T. 12/10/07 at 25, 140.  In furtherance of this argument, the government also sought to persuade the jury that the time frame during which plaintiffs were subjected to the alleged abuse was relatively short.[11]

          Faced with the evidence summarized above, however, the court concludes that the jury could properly have found that plaintiffs were subjected to a hostile workplace environment. The jury clearly credited plaintiffs' testimony, and that of their witnesses, and was not persuaded by the evidence presented by defendant.  As discussed supra, in deciding defendant's motion for

---

[11]     The government argued that Mr. Fisher arrived to work full-time in the Philadelphia Field Division on January 14, 2002, he was out of the office for ten days to two weeks at the end of January 2002, and plaintiffs filed their EEOC complaint on March 8, 2002. (N.T. 12/10/07 at 129-31.)

judgment as a matter of law, the court may not weigh the evidence presented at trial, determine credibility of witnesses, or substitute its version of facts for that of the jury.  See Lightning Lube, 4 F.3d at 1166.  Plaintiffs presented sufficient evidence from which a jury could find liability on the race discrimination claim.  Accordingly, defendant's motion for judgment as a matter of law on plaintiffs' race discrimination claim will be denied.

**B.      Retaliation Claim**

Defendant also seeks judgment as a matter of law on the basis that plaintiffs failed to prove their retaliation claim.  (Mot. at 7-14.)  Specifically, defendant contends that plaintiffs' retaliation case failed to prove: that plaintiffs' transfers harmed them, that there was retaliation in connection with the Suitability Review Protocol ("SRP") that was utilized to determine whether plaintiffs were fit to return to work, that plaintiffs' removal from administrative leave was retaliatory, and that the allegedly fraudulent memoranda had any impact on plaintiffs' employment.  (Mot. at 7-14.)  Accordingly, defendant seeks judgment as a matter of law pursuant to Fed. R. Civ. P. 50(b).

With respect to the retaliation claim, the court instructed the jury that in order to prove that defendant retaliated against plaintiffs after they filed complaints of discrimination with the EEOC, plaintiff had the burden of proving: (1) that they filed EEOC complaints; (2) that plaintiffs were subjected to material adverse actions at the time or after they filed their EEOC complaints; and (3) there was a causal connection between the actions taken by defendant and the filing of the EEOC complaints by plaintiffs.  (N.T. 12/13/07 at 96-97.)  See Moore v. City of Philadelphia, 461 F.3d 331, 340-41 (3d Cir. 2006) (setting forth standard for a prima facie case of retaliation under Title VII).

In <u>Burlington Northern & Santa Fe Railway Co. v. White</u>, 126 S. Ct. 2405, 2415 (2006), the United States Supreme Court recently described the level of seriousness to which harm must rise before it becomes actionable retaliation.  The Court held that "a plaintiff must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination."  <u>Id.</u>  The Court noted that "it is important to separate significant from trivial harms" and that "normally petty slights, minor annoyances, and simple lack of good manners" will not deter victims from complaining to the EEOC, the courts, and their employers.  <u>Id.</u>

Plaintiffs contend that the evidence they presented at trial regarding defendant's actions after March 11, 2002 clearly meets the standard for "adverse employment action" under <u>White</u>.  According to plaintiffs, the facts adduced at trial demonstrate that the actions taken by Mr. Fisher, Mr. Jones and other DEA personnel were "materially adverse" to plaintiffs such that they would have dissuaded a reasonable worker from making or supporting a charge of retaliation.  (Pls.' Mem. of Law at 30.)  Plaintiffs contend that the components of their retaliation claim included:

> (1) their removal from their respective positions on or about April 4, 2002; (2) the generation of the false memoranda by Fisher; (3) Fisher's decision to photograph McKenna's office, and Jones' decision to go along with it; (4) the transparently biased and patently inadequate OPR investigations conducted of Fisher's and Jones' misconduct; (5) the manner in which DEA disparately treated McKenna and Marthers during their respective SRP's; (6) Fisher's conduct with respect to Marthers on March 11, 2002, immediately after he learned from Marthers that EEO complaints were filed against him; (7) Fisher's decision to request an OPR investigation of McKenna, and TFO Brown, regarding the CPR incident; and (8) Jones' offensive comments about them to other DEA employees.

23

(Pls.' Mem. of Law at 30-31.)

The court finds that the evidence presented at trial was sufficient to support the jury's findings in favor of plaintiffs on the retaliation claim.  The jury heard lengthy testimony from plaintiffs and their witnesses regarding plaintiffs' claims that defendant retaliated against them after they filed EEOC complaints.  A summary of the relevant evidence follows:

### 1.   **Temporal Proximity**

Plaintiffs aver that the evidence presented at trial supports a compelling case of causation based upon the temporal proximity of plaintiffs' filing of their EEOC complaints and the actions subsequently taken by defendant against plaintiffs.  (Pls.' Mem. of Law at 36-38.) Specifically, plaintiffs allege that the retaliatory conduct commenced immediately after Mr. Fisher learned that plaintiffs had filed EEOC complaints against him.

On March 8, 2002, plaintiffs filed discrimination complaints with the EEOC against Mr. Fisher and Mr. Jones.  (N.T. 12/10/07 at 65.)  Plaintiffs contend that Mr. Fisher was made aware of the existence of the EEOC complaints on March 11, 2002 when he was told by Mr. Marthers and retaliated against plaintiffs thereafter.  In contrast, Mr. Fisher contends that he was first made aware of the EEOC complaints on April 15, 2002.  (Ex. 203.)  Mr. Jones also testified in deposition testimony that he was made aware of the EEOC complaints on April 15, 2002.  (N.T. 12/12/07 at 79.)

At trial, Mr. Marthers explained the events surrounding his conversation with Mr. Fisher during which he notified Mr. Fisher that he had filed an EEOC complaint against him. Mr. Marthers testified that on March 11, 2002, he had a series of confrontational meetings with Mr. Fisher, one of which nearly resulted in a physical altercation.  (N.T. 12/10/07 at 66-77.)

During the course of the first meeting on March 11, 2002 while discussing an issue about Mr. Marthers' time sheet,[12] Mr. Marthers informed Mr. Fisher that he had filed an EEOC complaint against him.  (N.T. 12/7/07 at 52; N.T. 12/10/07 at 69.)  Mr. Marthers and Mr. Fisher had another confrontation when Mr. Marthers was called into Mr. Fisher's office later that afternoon to discuss an allegation that Mr. Marthers had neglected his duties and failed to timely obtain a confidential source number for another group supervisor.  (N.T. 12/10/07 at 70-74.)  Upset with the manner with which Mr. Fisher treated Mr. Marthers during the second meeting, Mr. Marthers called the acting SAC and requested a meeting; ASAC O'Hara included Mr. Fisher in the meeting.  (N.T. 12/10/07 at 75.)  Mr. Marthers clarified during the meeting with ASAC O'Hara that there had been a miscommunication and that he obtained the confidential source number, although he initially was unable to do so because the computer system malfunctioned during his first attempt.  (N.T. 12/10/07 at 75-76.)  Mr. Fisher accused Mr. Marthers of an integrity violation by misleading the ASAC.  (N.T. 12/10/07 at 75-76.)  Mr. Marthers was concerned by Mr. Fisher's accusation, because an integrity violation could have resulted in the termination of his employment.  (N.T. 12/10/07 at 76.)

Plaintiffs, therefore, contend that Mr. Fisher was made aware that they had filed EEOC complaints against Messrs. Fisher and Jones on March 11, 2002, when Mr. Marthers so advised Mr. Fisher.  (N.T. 12/10/07 at 69.)  In a March 11, 2002, memorandum addressed to Mr. Marthers, Mr. Fisher acknowledged that Mr. Marthers advised him "that you were not in the

---

[12]     Mr. Marthers testified that he felt that Mr. Fisher was questioning the accuracy of the representations Mr. Marthers made on his time sheet.  (N.T. 12/10/07 at 133.)  On cross-examination, when asked whether he had ever lied on a time sheet, he admitted that he had. (N.T. 12/10/07 at 135.)

office working [on the date at issue], but were at home working on your EEO Complaint."  (N.T.
12/10/07 at 95-96; Ex. 14.)  In deposition testimony read into the record at trial, Mr. Fisher
testified that the reference in the memorandum to "your EEO complaint" was a "typo."  (N.T.
12/11/07 at 125-52.)  Mr. Fisher maintained that he was not made aware of plaintiffs' EEOC
complaints until April 15, 2002.  (N.T. 12/11/07 at 125-52.)  Although the March 12, 2002
memorandum references an EEOC complaint, Mr. Fisher claimed that he was not aware that it
concerned an EEOC complaint against him.  (N.T. 12/11/07 at 125-52.)  Moreover, in the
affidavit he supplied in connection with the EEOC investigation, Mr. Fisher represented that he
was notified of the EEOC complaint on April 15, 2002.  (N.T. 12/10/07 at 96; Ex. 203.)

## 2.     Transfers out of the SSU Unit

Plaintiffs offered as evidence of retaliation their transfers out of the SSU unit, and
several subsequent situations involving the transfers.  Specifically, plaintiffs contend that they
were transferred out of the SSU unit in retaliation for the filing of their EEOC complaints.  Mr.
McKenna was detailed out of the Demand Reduction position via a memorandum on April 4,
2002, with an effective date of April 8, 2002.  (N.T. 12/7/07 at 51; Ex. 72.)  He was transferred
to the Asset Removal Group and Special Agent Kim Thompson replaced Mr. McKenna in his
Demand Reduction activities.  (N.T. 12/7/07 at 53.)  Mr. Marthers also was replaced in his
position by Special Agent John Smith pursuant to the April 4 memorandum.  (N.T. 12/7/07 at 53-
54; Ex. 72.)  Mr. McKenna contended that his transfer out of the Demand Reduction Coordinator
position was in retaliation for the filing of the EEOC complaint.  (N.T. 12/7/07 at 145.)  Mr.
Marthers also testified that the DEA's decision to detail another agent into the Confidential
Source Coordinator position by memorandum dated April 4, 2002, while he was absent from the

office on sick leave for work-induced stress, was in retaliation for the filing of his EEOC complaint.  (N.T. 12/10/07 at 144-46.)

When Mr. McKenna was detailed out of the Demand Reduction Coordinator position, he was instructed by the acting Special Agent in Charge to move out of his office. (N.T. 12/7/07 at 64.)  Some time soon after April 8, 2002, Mr. Fisher instructed Ms. Grant to photograph Mr. McKenna's office.  (N.T. 12/7/07 at 64-65, 154; N.T. 12/11/07 at 140.)  Mr. McKenna believed that his office was photographed in retaliation for filing the EEOC complaint. (N.T. 12/7/07 at 154.)  Mr. Fisher testified that he instructed Ms. Grant to photograph the office so that Mr. McKenna could not claim that Mr. Fisher stole anything from the office.  (N.T. 12/11/07 at 136-41.)  Mr. Fisher conceded that he had never ordered another agent's office to be photographed.  (N.T. 12/11/07 at 140-41.)[13]

Sometime after the April 4, 2002 memorandum detailing Mr. McKenna out of the Demand Reduction Coordinator position, William Nelson, an Assistant Special Agent in Charge in the Philadelphia Field Division, spoke with Mr. Jones about his directive to move Mr. McKenna out of his office.  (N.T. 12/10/07 at 208-12.)  Mr. Nelson was to be Mr. McKenna's supervisor in his new position in the Asset Forfeiture Unit.  (N.T. 12/10/07 at 201-03, 208.) According to Mr. Nelson, Mr. Jones approached Mr. Nelson in a confrontational manner and said, "I want that f---ing McKenna out of that office today."  (N.T. 12/10/07 at 209.)  Mr. Nelson

---

[13]   Mr. Jones also accused Mr. McKenna of failing to provide his replacement in the Demand Reduction Coordinator position with information relevant to that position, when Mr. McKenna had already done so.  (N.T. 12/10/07 at 211-13; N.T. 12/11/07 at 6-9; Ex. 33 at pp. 32-34.)

testified that Mr. Jones' use of language was unprofessional and said in a degrading manner. (N.T. 12/10/07 at 209-10.)

After his transfer to the Asset Forfeiture unit, Mr. McKenna complained to his then supervisor, Mr. Nelson, that Mr. Fisher claimed to a representative of Radnor High School that Mr. McKenna was a "liar" and that was the reason he was removed from the Demand Reduction Coordinator position.  (N.T. 12/11/07 at 11-14.)  Mr. Nelson testified that Mr. Jones' statement was a "very serious allegation" and spoke with Mr. Jones to inform him that it "may involve an OPR issue."  (N.T. 12/11/07 at 13.)

Mr. Nelson further testified that he had a conversation with Mr. Jones in late April 2002 regarding Mr. Nelson's upcoming retirement from the DEA at the end of May 2002.  (N.T. 12/11/07 at 16-19.)  During the conversation, Mr. Jones informed Mr. Nelson that he would be out of the office for several days during May and asked Mr. Nelson to be the acting SAC in his absence.  Id.  However, Mr. Nelson learned from another ASAC that, instead, he would be sent to the New York field division for the month of May 2002 on a temporary duty assignment because Mr. Jones informed the SAC of the New York field division that he had an extra ASAC in Philadelphia.  Id.  Mr. Nelson felt that his temporary assignment to New York immediately prior to his retirement was a result of several conversations he had with Mr. Jones during April 2002 concerning Mr. McKenna.  Id.  Mr. Nelson testified that each time he spoke with Mr. Jones regarding Mr. McKenna during April 2002, Mr. Jones "seemed to become very irritated."  (N.T. 12/11/07 at 19.)

3.    **EEOC Investigation**

Plaintiffs argue that Mr. Fisher fraudulently generated a series of memoranda to justify his mistreatment of plaintiffs and in retaliation for the filing of the EEOC complaints. (Pls.' Mem. of Law at 28-41.)  Plaintiffs further contend that the memoranda contain false statements regarding plaintiffs' job performances.  Id.

Gina Campisano, the EEOC investigator assigned to plaintiffs' case, met with Mr. Fisher in Fall 2002 and prepared an affidavit for his review and signature.  (N.T. 12/11/07 at 23-25, 158.)  In connection with her investigation, Mr. Fisher provided Ms. Campisano with written memoranda to further support the statements in his affidavit.  (N.T. 12/11/07 at 25-26, 159-60.)  The memorandum were addressed from Mr. Fisher to Messrs. McKenna and/or Marthers and were dated between February 11, 2002 and March 13, 2002  (Exs. 1-8, 9-15.)  The memoranda appeared to be disciplinary in nature and detailed performance issues regarding each plaintiff. (N.T. 12/11/07 at 26.)  The memoranda were dated contemporaneously with the purported job performance incidents.  (N.T. 12/11/07 at 26.)  Mr. Fisher requested that the memoranda be included with his affidavit pertaining to the EEOC investigation.  (N.T. 12/11/07 at 30-31; Exs. 203, 204.)  As a result of his representations in the affidavit, Ms. Campisano believed that Mr. Fisher had given the memoranda to plaintiffs contemporaneously with the dates on which they were drafted.  (N.T. 12/11/07 at 32-33, 38-39.)

In October 2002, plaintiffs learned about the existence of the memoranda from Ms. Campisano.  (N.T. 12/7/07 at 68-69; N.T. 12/11/07 at 34.)  Neither Mr. McKenna nor Mr. Marthers saw these memoranda, which appeared to be disciplinary in nature, until November 2002.  (N.T. 12/7/07 at 70-71, 81, 155; N.T. 12/10/07 at 87-88.)  Ms. Campisano testified that

Mr. Fisher never told her that he had not given the memoranda to plaintiffs.  (N.T. 12/11/07 at

33.)  In an EEOC hearing dated March 3, 2004, however, Mr. Fisher testified that he told Ms.

Campisano that he had not given the memoranda to plaintiffs.  (N.T. 12/11/07 at 35-36, 160-61;

Ex. 207.)  In deposition testimony, Mr. Fisher acknowledged that he did not give the memoranda

to plaintiffs.  (N.T. 12/11/07 at 154-56.)

      Plaintiffs contend that the dating of the memoranda and the fact that the

memoranda are addressed to plaintiffs suggest that Mr. Fisher provided the memoranda to

plaintiffs at or near the time they were drafted, when in fact, plaintiffs had no knowledge of them

until October 2002 at the earliest.[14]  (N.T. 12/7/07 at 159-60; N.T. 12/10/07 at 87-88.)  Plaintiffs

also testified to various factual misrepresentations in the memoranda.  (N.T. 12/7/07 at 74-81;

N.T. 12/10/07 at 89-96.)  After learning of the existence of the memoranda, plaintiffs were

permitted to review their DEA personnel files to determine whether the memoranda prepared by

Mr. Fisher were in the files; the memoranda were not in the personnel files.  (N.T. 12/7/07 at 82,

156; N.T. 12/10/07 at 98.)

      Plaintiffs contacted OPR in January 2003 to request that an investigation be

conducted into the production of the memoranda because they believed the memoranda were

fraudulently produced in that they were predated and actually prepared on dates subsequent to the

dates listed on the memoranda.  (N.T. 12/7/07 at 83; N.T. 12/11/07 at 43-45; Exs. 59, 60.)

---

[14]    Plaintiffs also offered as further evidence of Mr. Fisher's suspicious actions
regarding the memoranda the fact that Mr. Fisher provided the memoranda to OPR investigators
in July 2002.  (N.T. 12/7/07 at 71-72; N.T. 12/11/07 at 83-85, 163-68; Ex. 33.)  However, the
copies submitted in connection with the OPR investigation in July 2002 were not signed by Mr.
Fisher, while the copies of the memoranda supplied in the EEOC investigation in November
2002 were signed by Mr. Fisher.  (N.T. 12/7/07 at 73-74; N.T. 12/11/07 at 83-85.)  Compare Ex.
1-15 with Ex. 33.

Specifically, plaintiffs contend that the memoranda were prepared subsequent to the filing of the

EEOC complaints by plaintiffs.  An OPR investigation was conducted and Mr. Fisher was

cleared of the allegations of fraudulently producing the memoranda.  (N.T. 12/7/07 at 84-85;

N.T. 12/10/07 at 175; N.T. 12/11/07 at 43, 66-73, 154; Ex. 35.)  Plaintiffs suggest that the OPR

investigation was inadequate.

**4.      Procedural Irregularities during SRPs**

Plaintiffs contend that the DEA retaliated against them for filing the EEOC

complaints by employing procedural irregularities during the SRP that was utilized to determine

whether plaintiffs were fit to return to work.  (Pls.' Mem. of Law at 31-35.)

Mr. McKenna.  Mr. McKenna was absent from the office from April 4, 2002

through July 2002 on worker's compensation leave as a result of knee surgery.  (N.T. 12/7/07 at

87.)  Subsequently, Mr. McKenna filed a claim with the Department of Worker's Compensation

alleging that he suffered from workplace stress beginning January 17, 2002.  (N.T. 12/7/07 at 90-

91; Ex. 125.)  In connection with the claim, Mr. McKenna's physician submitted a letter to the

DEA health unit detailing the basis for the stress claim.  (N.T. 12/7/07 at 90-94; Ex. 127.)  The

DEA then recommended Mr. McKenna undergo an SRP examination.  (N.T. 12/7/07 at 94.)

In connection with the SRP, Mr. McKenna was examined in September 2002 for

fitness for duty.  (N.T. 12/7/07 at 94-95.)  After Mr. McKenna was evaluated, his leave status

changed to administrative leave.  (N.T. 12/7/07 at 95.)  Mr. McKenna was notified of the results

of the SRP in January 2003; he was given a proposed termination letter on the basis that he was

unfit for duty, along with a treatment agreement.  (N.T. 12/7/07 at 95, 101-02.)  Mr. McKenna

was given the option of signing the treatment agreement or his employment would be terminated.

(N.T. 12/7/07 at 102; Ex. 146.)  Mr. McKenna sought to negotiate what he deemed to be the
onerous terms of the treatment agreement.  (N.T. 12/7/07 at 103, 147, 174-76; Ex. 149.)
Moreover, because five months had passed from the time Mr. McKenna was examined by the
DEA doctors in September 2002 and Mr. McKenna's doctors had recently opined that he was fit
for duty, Mr. McKenna and his attorney requested another examination by the DEA.  (N.T.
12/7/07 at 104-06.)

       Because Mr. McKenna's fitness for duty evaluation was deemed "stale," he was
reevaluated by the DEA medical staff in April 2003.  (N.T. 12/7/07 at 106.)  At the time he was
given the proposed treatment agreement in January 2003, Mr. McKenna was removed from
administrative leave and was forced to use his sick and/or annual leave, although he did not
authorize the use of his sick and/or annual leave.  (N.T. 12/7/07 at 108-09; N.T. 12/12/07 at 147.)
Pursuant to DEA policy, Mr. McKenna was entitled to notice that his sick and/or annual leave
was going to be used, but the DEA did not so notify Mr. McKenna.  (N.T. 12/12/07 at 148.)

       The results of the second SRP were produced in June 2003 with the opinion that
Mr. McKenna was fit to return to the workplace and with the recommendation that Mr. McKenna
be returned to a limited duty status.  (N.T. 12/7/07 at 111-12; Exs. 151, 152, 154.)  Mr. McKenna
contacted Margaret Ann Hager, a supervisory human resource specialist with the DEA, and
requested that the DEA expedite the SRP process because he was about to be placed on leave
without pay status and to request that his annual and sick leave be restored.  (N.T. 12/7/07 at 110,
118, 128; Exs. 153, 157, 159, 161, 162, 163, 165.)  As a result, Ms. Hager contacted the
Department of Justice ("DOJ") attorney who handles administrative leave cases to determine
whether there was any relief available to convert Mr. McKenna's upcoming leave without pay

status.  (N.T. 12/12/07 at 129.)  After initially receiving negative feedback from the DOJ

attorney, Ms. Hager was informed by another DOJ official that she could submit a written

request to convert Mr. McKenna's leave without pay status to administrative leave, retroactive to

when the leave without pay status first began.  (N.T. 12/12/07 at 130-31, 134.)  However, Mr.

McKenna testified that he remained on leave without pay status for ten weeks, until October 20,

2003, when he ultimately was returned to work on a limited duty status.  (N.T. 12/7/07 at 110.)

       Plaintiffs also contend that defendant delayed Mr. McKenna's return to full duty

status.  In a memorandum dated January 23, 2004, Mr. McKenna was cleared to return to full

duty status, but he remained on limited duty status until March 2004.  (N.T. 12/7/07 at 116; N.T.

12/12/07 at 160-61; Ex. 171.)  On cross-examination, Ms. Hager admitted that "two months later

this letter putting [Mr. McKenna] back to work [was] still sitting on [her] desk."  (N.T. 12/12/07

at 161.)

       <u>Mr. Marthers.</u>  Mr. Marthers testified that he became physically ill beginning

March 11, 2002 as a result of the stressful incidents at the DEA.  He was out of the office on sick

leave beginning March 12, 2002 on the advice of his physicians while he awaited the results of a

stress test.  (N.T. 12/10/07 at 78-80, 98-101, 169.)  A questionnaire sent by the DEA to Mr.

Marthers' treating psychiatrist dated May 13, 2002 reflects that Mr. Marthers was diagnosed with

major depression.  (N.T. 12/10/07 at 102-03; Ex. 97.)  Mr. Marthers was subsequently placed on

administrative leave in June 2002 and notified that he would undergo an SRP.  (N.T. 12/10/07 at

104, 169; Exs. 100, 101.)  In connection with the SRP, Mr. Marthers was examined in August

2002 by the DEA's medical team; Mr. Marthers received the results of his fitness-for-duty

examination in January 2003.  (N.T. 12/10/07 at 106; Exs. 103-04.)  Mr. Marthers remained on

administrative leave while he awaited the results of the SRP.  (N.T. 12/10/07 at 107.)  Mr.

Marthers was found unfit for duty.  (N.T. 12/10/07 at 111; Exs. 103-04.)  Like Mr. McKenna,

Mr. Marthers also was given a proposed termination letter on the basis that he was unfit for duty,

along with a treatment agreement.  (N.T. 12/10/07 at 113; Ex.110.)  Mr. Marthers was given the

option of signing the treatment agreement or his employment would be terminated.  (N.T.

12/10/07 at 113; Ex. 110.)  Mr. Marthers sought to negotiate what he deemed to be the onerous

terms of the treatment agreement.  (N.T. 12/10/07 at 113-14, 159-60; Ex. 112.)  Because Mr.

Marthers' fitness for duty evaluation was deemed "stale," he was reevaluated by the DEA

medical staff in April 2003.  (N.T. 12/10/07 at 114-15, 164-65.)  At the time he was given the

proposed treatment agreement in January 2003, Mr. Marthers was removed from administrative

leave and was forced to use sick and/or annual leave, although he did not authorize the use of his

sick and/or annual leave.  (N.T. 12/10/07 at 115-17; N.T. 12/12/07 at 147.)  Pursuant to DEA

policy, Mr. Marthers was entitled to notice that his leave was going to be used, but the DEA did

not so notify Mr. Marthers.  (N.T. 12/12/07 at 148.)  By letter dated July 11, 2003, Mr. Marthers

was notified that he had been returned to full-unrestricted active duty.  (N.T. 12/10/07 at 117; Ex.

123.)  Because his sick and annual leave had been exhausted, Mr. Marthers was on leave-

without-pay status for a short period of time before he was returned to unrestricted duty.  (N.T.

12/10/07 at 119.)  Mr. Marthers returned to full-time work on July 14, 2003.  (N.T. 12/10/07 at

119-20.)

   SRP Procedures.  Ms. Hager testified that the DEA has established time lines for

the SRP process, but that the processing of individual cases rarely abides by the time lines.  (N.T.

12/12/07 at 131-32.)  According to Ms. Hager, Mr. McKenna's case was processed in a

comparable time frame as other SRP cases and Mr. Marthers' case proceeded more quickly than the typical case.  (N.T. 12/12/07 at 132.)

Mr. McKenna, however, alleged that the DEA retaliated by delaying his return to work because he did not sign the treatment agreement in January 2003.  (N.T. 12/7/07 at 114.) Plaintiffs maintain that they never <u>refused</u> to sign the proposed treatment agreements, but rather plaintiffs, through their attorney, sought renegotiation of their terms.  (N.T. 12/12/07 at 147; Ex. 149.)  Plaintiffs further contend that defendant retaliated against plaintiffs by using plaintiffs' annual and sick leave without their authorization.  (N.T. 12/12/07 at 135-37, 147-49.)  Plaintiffs argue that in January 2003 when she was involved in the process of converting plaintiffs' status from administrative leave to enforced use of annual and sick leave, Ms. Hager was aware that plaintiffs previously filed EEOC complaints.  Ms. Hager testified that she read plaintiffs' medical documentation in November or December 2002 which mentioned the existence of the EEOC complaints and thus was aware in January 2003 that plaintiffs had filed EEOC complaints.  (N.T. 12/12/07 at 130-31, 149-50, 153.)  However, Ms. Hager also testified that when she read the medical documentation, she did not focus on that issue.  (N.T. 12/12/07 at 130-31, 149-50, 153.) Rather, Ms. Hager testified that the first time she recalled recognizing that plaintiffs had filed EEOC complaints was during a conversation that she had with a DEA attorney regarding the conversion of plaintiffs' leave status.  (N.T. 12/12/07 at 130-31, 149-50.)  Ms. Hager testified that her conversation with the DEA attorney took place after Mr. McKenna had entered leave without pay status, which would have been after January 2003.  <u>See</u> N.T. 12/12/07 at 130-31, 149-50.  Ms. Hager also testified that during her tenure with the DEA, she was not aware of any

other cases in which an employee had been the subject of enforced leave under circumstances where he did not consent.  (N.T. 12/12/07 at 153.)

Mr. John Driscoll, who was at the time the acting chief inspector of OPR, detailed the reasons Mr. McKenna had not yet been returned to work in a memorandum dated July 16, 2003.  (N.T. 12/7/07 at 114-15, 190-96; N.T. 12/12/07 at 145-46; Ex. 156.)  One of the reasons Mr. Driscoll provided for recommending that Mr. McKenna should not be returned to limited duty work, inter alia, was that Mr. McKenna was "relying on legal issues to improve his condition."  (N.T. 12/12/07 at 201.)  Plaintiffs, therefore, contend Mr. Driscoll was aware that Mr. McKenna had filed an EEOC complaint at the time he recommended that Mr. McKenna not be returned to work in July 2003 and that the decision to delay Mr. McKenna's return to work was in retaliation for the filing of the EEOC complaint.

Viewing the foregoing evidence in the light most favorable to plaintiffs, the court finds that plaintiffs presented sufficient evidence from which the jury reasonably could find liability on plaintiffs' retaliation claim.  In deciding defendant's motion for judgment as a matter of law, this court may not weigh the evidence presented at trial, determine credibility of witnesses, or substitute its version of facts for that of the jury.  In the present case, plaintiffs have presented evidence that meets the standard for adverse employment action under White.  Insofar as the jury found that the alleged retaliatory actions were materially adverse, its findings are adequately supported.  Thus, the court determines that based on the evidence summarized supra, the jury could properly find a verdict for plaintiffs.

36

### C.   Cross-Examination of Plaintiffs Through Prior Instances of Misconduct

In its present Motion, defendant argues that it is entitled to a new trial based upon the court's in limine ruling which precluded defendant from cross-examining plaintiffs through prior instances of misconduct under Federal Rules of Evidence 608(b) and 403.  (Mot. at 14-18.) Specifically, defendant sought to raise the issue that plaintiffs are Giglio impaired and sought to cross-examine plaintiffs with respect to the incidents that led to such impairment.  With respect to Mr. Marthers, defendant presently argues that the underlying events shaped Mr. Marthers' subsequent DEA career and impacted his perception of events, particularly with respect to racial interactions.  (Mot. at 15.)  Defendant avers that it was precluded from asking plaintiffs about the emotional damage they suffered because of demotions, being prevented from testifying, and other humiliations related to their own misconduct that cannot be blamed on Mr. Fisher or Mr. Jones. (Mot. at 16-17.)  Defendant, therefore, contends that allowing the verdict to stand would be a miscarriage of justice and a new trial should be granted.

The Federal Rules of Evidence require that evidence must be relevant to be admissible.  Fed. R. Evid. 402.  The Federal Rules of Evidence also limit a party's right to attack a witness' credibility, if that attack is predicated upon the witness' prior conduct.  Under Rule 608(b), specific instances of conduct of a witness, other than conviction for a crime, may not be proved at trial through extrinsic evidence for the purpose of attacking the witness's character for truthfulness.  Fed. R. Evid. 608(b).  Where a witness whose credibility is challenged concedes the alleged acts and where credibility is the critical issue, however, there is no need to invoke Rule 608(b)'s ban on extrinsic evidence.  Carter v. Hewitt, 617 F.2d 961, 971-72 (3d Cir. 1980). The court may at its discretion permit questioning about specific instances of conduct on

cross-examination, but only if the conduct is probative of the witness's character for truthfulness

or untruthfulness.  Fed. R. Evid. 608(b).  In determining whether an incident has bearing on a

witness' credibility, a court may consider the remoteness in time of the incident.  <u>Johnson v. Elk</u>

<u>Lake Sch. Dist.</u> 283 F.3d 138, 146 n.2 (3d Cir. 2002) (citing 4 Weinstein's Federal Evidence

(Joseph M. McLaughlin ed., 2d ed. 2001), § 608.22[2][c], at 608-63 & nn. 42-43 ).  <u>See also</u>

<u>United States v. Lundy</u>, 416 F. Supp. 2d 325, 330-31 (E.D. Pa. 2005) (noting that remoteness

may reduce the value of certain evidence).  Once the court finds that the proffered evidence falls

within the purview of Rule 608(b), such evidence must then be evaluated under Rule 403 to

determine whether its probative value is substantially outweighed by the danger of unfair

prejudice, confusion of the issues, or misleading the jury.  <u>United States v. Bocra</u>, 623 F.2d 281,

288 (3d Cir.1980).  The court is afforded "broad discretion" in making a Rule 403 determination.

<u>Sprint/United Management Co. v. Mendelsohn</u>, 128 S. Ct. 1140, 1145 (2008).

   In their motion <u>in limine</u>, plaintiffs, <u>inter alia</u>, sought to bar the government from

cross-examining them through prior instances of misconduct under Federal Rules of Evidence

608(b) and 403.  The principal reason plaintiffs sought to bar cross-examination of their prior

acts of misconduct was that the incidents were remote in time, and accordingly, their probative

value had diminished.[15]

---

[15]  Mr. McKenna's misconduct occurred in November 1991.  During an OPR
investigation, Mr. McKenna omitted pertinent facts from a report he prepared concerning an
undercover operation.  <u>See</u> Ex. D. to Pls.' Mot. in Limine at 2-3.  As a result of the OPR
investigation, Mr. McKenna was suspended without pay for five days.  <u>Id.</u>  Mr. Marthers'
misconduct took place in 1997 while he was assigned to the DEA's Mobile, Alabama office.  <u>See</u>
Ex. E to Pls.' Mot. in Limine at 2-3.  During the evening of July 4, 1997, Mr. Marthers drove his
official government vehicle to a drinking establishment, brandished his firearm while therein,
and pulled over the vehicle of Christopher Cummings, an African-American male.  <u>Id.</u>  Mr.
Cummings accused Mr. Marthers of making racially derogatory remarks during the stop.  <u>Id.</u>

Prior to the commencement of the trial, the court heard oral argument on plaintiffs' motion in limine request to bar the government from cross-examining them through prior instances of misconduct.  See N.T. 12/6/07 at 19-34.  During oral argument on the motion in limine, defense counsel argued that the evidence was relevant to plaintiffs' credibility. Defense counsel represented to the court that it did not seek to use extrinsic evidence of plaintiffs' misconduct, rather it sought to elicit testimony from plaintiffs on cross-examination. See N.T. 12/6/07 at 29.  Defense counsel further represented that it sought to cross-examine plaintiffs on an expert report prepared by plaintiffs' psychiatrist regarding the psychological impact on plaintiffs "from the events and occurrences at issue in the case."  (N.T. 12/6/07 at 20.) Defense counsel contended that the evidence it sought to introduce is "directly germane to the credibility of the witnesses."  (N.T. 12/6/07 at 21.)  According to defense counsel, if plaintiffs "[w]ere to testify for the prosecution in presumably a drug case, the U.S. Attorney would have to disclose to the defense that there's an issue that's relevant to their credibility, presumably reflects poorly on it.  It's difficult to imagine anything more central, if you will, intrinsic to the credibility analysis."  (N.T. 12/6/07 at 21.)

During the oral argument, the court repeatedly sought clarification from defense counsel regarding its argument that the court should permit cross-examination of plaintiffs with respect to the incidents that led to the Giglio impairment.  See N.T. 12/6/07 at 22-25.  Upon questioning from the court, defense counsel agreed that the line of questioning which they sought

---

When interviewed by OPR, Mr. Marthers admitted that, as an attempt to cover up the incident, he falsified a time sheet with regard to the hours he worked on July 3 and 4, 1997.  Id.  As a result of the incident, Mr. Marthers entered into a Negotiated Last Chance Agreement, was demoted, and received a sixty-day suspension without pay.  Id.

would not be offered in response to an allegation of discrimination and retaliation.  (N.T. 12/6/07 at 24.)  Rather, defense counsel sought to introduce evidence that the government had made a determination that plaintiffs could not be used as witnesses "because it's so intrinsic to the credibility analysis that it would be . . . something that ought to be fair game in any case in which the plaintiffs testified."  (N.T. 12/6/07 at 24-25.)  In response, plaintiffs' counsel argued that the Giglio letters do not suggest that plaintiffs cannot testify in criminal cases, but rather, merely notify plaintiffs that if they are prospective witnesses in a criminal case, they must notify the prosecutor.  (N.T. 12/6/07 at 25.)  Plaintiffs' counsel further argued that the evidence at issue was not sufficiently probative on the issue of credibility because it was too remote; the incidents at issue occurred in 1991 and 1997.  (N.T. 12/6/07 at 26-27.)

> Based upon the argument of the parties, the court ruled as follows:

> I'm going to rule that I'm going to bar the use of [the information] under 608 on cross examination of the plaintiffs.  I do find Mr. Roth's argument persuasive that because of the remoteness of this information, 1991 with respect to McKenna, 1997 with respect to . . . Marthers, that the probative value of this information is outweighed by the potential, real potential of unfair prejudice to both the plaintiffs.  I think it would lead to confusion of the issues to the jury, but probably more importantly, it could lead to some type of mini-trial on this whole issue.

> \* \* \*

> Mr. Bernstein, I understand if you had said to me this evidence explains how we treated these . . . [plaintiffs]; in other words, we assigned them to a desk job as opposed to putting them in the field and that may explain why they were treated the way they were treated, I can understand that.  But you're not offering it for that purpose, and you said that pretty clear to me, so I'm not allowing it.  If you said to me we're going to introduce it as substantive evidence to explain, you know, why we put Mr. McKenna on the desk because we couldn't use him as a field agent because of this problem and that would explain why he did certain things, but you're not making that offer to me.  So that's my ruling.

40

(N.T. 12/6/07 at 30-31.)  After the court so ruled, defense counsel sought clarification and noted

that, with respect to Mr. Marthers, the incidents in question led to his demotion and the <u>Giglio</u>

issue "affected their whole career and it affected a lot of the circumstances that they have faced in

their career."  (N.T. 12/6/07 at 32.)  The court responded:

> Well, that's what I asked you.  I just asked Mr. Bernstein and you a moment ago
> because I could see the relevance of that.  Look, if they're complaining, 'I never
> got nice assignments, I was never able to do this, you know, Fisher and Dempsey
> put me in a desk or put me on these horrible assignments,' and then Fisher and
> Dempsey said, 'We couldn't use these agents because they were <u>Giglio</u> impaired,
> that's why we did this,' that explains and would be a defense against any claims of
> retaliation or racial discrimination.  That's why I just asked you about it.  And if
> you said to me that's the purpose, I would say, yeah, it's relevant, clearly it's
> relevant. Is that what you're telling me now?

(N.T. 12/6/07 at 32.)  The court thus presented defense counsel with another opportunity to

support their argument that the evidence at issue should be admitted at trial.  Defense counsel,

however, merely reiterated that plaintiffs "were working in certain jobs . . . because of the

situation that they faced themselves in" and that "there's an issue – a racial incident within those

series of incidents."  (N.T. 12/6/07 at 32-33.)  Defense counsel emphasized that "in a case

involving perceptions about race, I think that's a highly relevant [sic], especially given the

closeness to the events as they occurred in 2001 and 2002."  (N.T. 12/6/07 at 33.)  Plaintiffs'

counsel then interjected that plaintiffs were not complaining about the positions that Mr. Fisher

or Mr. Jones put them in.  (N.T. 12/6/07 at 33.)  Based on the foregoing discussion, the court

concluded:

> [T]he only issue that was before me today and what was argued with me is
> whether under 608(b) on cross examination of these two plaintiffs could you bring
> up the incidents which are the basis of the memos of February '99 and August
> 2000 to show the truthfulness or untruthfulness of the two witnesses.  That's the
> only issue that was briefed as far as the motion <u>in limine</u>, and I'm not going to

41

allow it for that purpose; that's the sole purpose to test their truthfulness or untruthfulness.

Now, if it has some relevance as to some other purpose, to test the expert's opinion, to test the credibility of the expert, his expert opinion as to their psychiatric condition, whether it was caused or not caused by the actions of the . . . [plaintiffs], I'll reserve that for a later time.  If it explains – if the Government's offering it to explain why the . . . [plaintiffs] were treated a certain way they were treated, I'll reserve judgment on that.

* * *

But I'm not going to allow it if it's purely for the purpose under 608(b) to test their truthfulness or untruthfulness for the reasons I've already stated.

(N.T. 12/6/07 at 33-34.)

During trial, the court again addressed the <u>Giglio</u> impairment issue with counsel. During cross-examination of Mr. Marthers, plaintiff's counsel objected several times to the defense's line of questioning, arguing that defense counsel was attempting to question Mr. Marthers about the incidents underlying the <u>Giglio</u> impairment.  <u>See</u> N.T. 12/10/07 at 133-35, 149-51, 177-82.  At one point in the cross-examination, defense counsel attempted to elicit from Mr. Marthers testimony that the actions of the DEA in the SRP process had damaged his career. (N.T. 12/10/07 at 177.)  The court then excused the jury and clarified with plaintiffs' counsel that plaintiffs were not claiming that their careers were destroyed or that they were unable to obtain other employment because of the DEA's actions during the SRP process.  (N.T. 12/10/07 at 178.) Plaintiff's counsel again represented that plaintiffs claimed only emotional distress and loss of annual and sick leave.  (N.T. 12/10/07 at 178-79.)  Accordingly, the court reiterated its prior ruling that because the defense was not offering the incidents underlying the <u>Giglio</u> impairment for the purpose of explaining the way that Mr. Fisher and Mr. Jones treated plaintiffs, it would

42

not be admissible.  (N.T. 12/10/07 at 179-81.)  The court noted that because plaintiffs were not

arguing loss of career opportunities, the issues underlying the <u>Giglio</u> impairment were not

relevant.  (N.T. 12/10/07 at 181.)  The court also pointed out that it already had permitted defense

counsel, on cross-examination, to question Mr. Marthers about falsifying a time sheet, which was

the basis for the determination by the DEA that Mr. Marthers was impaired under <u>Giglio</u>.  <u>See</u>

N.T. 12/10/07 at 135.

   In its present Motion and Reply Brief, defendant argues that it was prejudiced

because the jury "did not obtain essential facts relevant to Mr. Marthers' state of mind and

psychological background that might well have effected the jury's determination as to both

liability and damages."  (Reply Br. at 10.)  In contrast to what it argued at oral argument on the

motion <u>in</u> <u>limine</u> and at sidebar during trial, defendant now argues that "in a case where a

Plaintiff's perception of actions by a member of the other race is central," the information

underlying the <u>Giglio</u> impairment "would greatly have impacted a juror's view of what happened

to Plaintiffs, especially Marthers."  (Mot. at 15.)  Defendant also contends that it was precluded

from inquiring into Mr. Marthers' reasons for why "he felt the need to go to a doctor for

anxiety/depression when he was assigned to the Confidential Source Coordinator position.  He

had previously testified that he knew he had no choice given his demotion and <u>Giglio</u> status, and

therefore, it made him very angry and depressed."  (Mot. at 16.)  The government contends that it

"raised these issues at the time of the Motion <u>in</u> <u>limine</u> arguments, and the Court agreed to revisit

these issues during the cross-examination of the Plaintiffs."  (Mot. at 17.)  <u>See</u> Reply Br. at 9-10.

   Because the basis for defendant's motion for a new trial is that the court erred in

deciding an evidentiary matter, the court must analyze whether the alleged error produced a result

inconsistent with substantial justice.  See Bhaya v. Westinghouse Elec. Corp., 709 F. Supp. 600,

601 (E.D. Pa.1989) (quoting Fed. R. Civ. P. 61), aff'd, 922 F.2d 184 (3d Cir. 1990).  See also

Fed. R. Evid. 103 ("Error may not be predicated upon a ruling which admits or excludes

evidence unless a substantial right of the party is affected.").  The court finds that its

determination which precluded defendant from cross-examining plaintiffs through prior instances

of misconduct under Federal Rules of Evidence 608(b) and 403 did not produce a result

inconsistent with substantial justice.  During oral argument on the motion in limine, defense

counsel represented that the prior incidents of misconduct would not be offered in response to an

allegation of discrimination and retaliation.  Rather, defense counsel sought to use the prior

incidents of misconduct solely to test plaintiffs' truthfulness.  See N.T. 12/6/07 at 21, 24-25.

During trial, however, defense counsel attempted to elicit testimony from Mr. Marthers that the

actions of the DEA in the SRP process damaged his career.  See N.T. 12/10/07 at 177.  Out of the

presence of the jury, the court clarified with plaintiffs' counsel that plaintiffs claimed only

emotional distress and loss of annual and sick leave; plaintiffs were not arguing loss of career

opportunities.  (N.T. 12/10/07 at 178-81.)  Accordingly, the court noted that plaintiffs' claims

were narrow and found that the evidence which defendant sought to introduce should be

excluded because the incidents were remote in time and the probative value of this information

was outweighed by the potential of unfair prejudice to both plaintiffs.

Thus, the court based its evidentiary ruling, in part, on defense counsel's

representation that the prior incidents of misconduct would not be offered in response to an

allegation of discrimination and retaliation.  Defense counsel represented that it sought to use the

prior incidents of misconduct solely to test plaintiffs' truthfulness.  The court permitted defense

counsel to cross-examine Mr. Marthers on a prior incident during which he falsified a time sheet. See N.T. 12/10/07 at 135.  During oral argument on the motion in limine, the defense did not claim that any employment actions which either Mr. Fisher or Mr. Jones took against plaintiffs were taken because they were Giglio impaired.  See N.T. 12/6/07 at 23-24, 31-32.  In addition, plaintiffs' claims did not include an argument that Mr. Fisher or Mr. Jones gave them inferior assignments.  See N.T. 12/6/07 at 33.  The evidence was not offered at trial, as the defense now claims, to explain how Mr. Marthers perceived events, especially racial issues.  The court determined that because the prior incidents of misconduct were remote in time, the probative value of this information was outweighed by the potential of unfair prejudice to both plaintiffs. The admission of the proposed evidence could have confused the jury and could have led to a mini-trial on the issue.  The court finds that a new trial is not warranted and the trial did not produce a result inconsistent with substantial justice.

Accordingly, defendant's Motion is denied.  An appropriate order follows.


BY THE COURT:


_____/s/ TJR_____
THOMAS J. RUETER
Chief United States Magistrate Judge